IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

CHRISTOPHER LEE JOYNER, JR.,

    Plaintiff,

v.                                                                                  **Civil Action No. 3:10CV406**

SERGEANT O'NEIL, *et al.*,

    Defendants.

## MEMORANDUM OPINION

Plaintiff Christopher Lee Joyner, Jr., a Virginia state inmate proceeding *pro se* and *in forma pauperis*, brings this complaint pursuant to 42 U.S.C. § 1983[1] (the "Complaint"). (Docket No. 1.) In his Complaint,[2] Joyner makes the following allegations:

> On Saturday May 22, 2010, I was in my cell with my window covered with toilet paper, I was told several times to remove the toilet paper from the door. I [did not] comply, soon thereafter 6-8 deputies was huddled on the outside of my cell door. I was told to lie on the floor, instead I remained seated on my bunk. The deputies did a count from 3-2-1 then the door came open, and all the

---

[1] 42 U.S.C. § 1983 states in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

[2] Because Joyner has not numbered the pages of his complaint consecutively, the Court will refer to the page numbers given this document by the CM/ECF system. Capitalization has been corrected in quotations to Joyner's submissions. Additionally, all parties agree that the Sergeant O'Neal named as a defendant on the docket is actually Sergeant G. O'Neil. (Br. Supp. Mot. Summ. J. 1; Resp. Defs. Mot. Summ. J. 1.) All future references to Sergeant O'Neil in this opinion will use the proper spelling of his name. Furthermore, the Clerk is DIRECTED to change the docket to reflect the correct spelling of Sgt. O'Neil's name.

>deputies rushed in to restrain me. After I was restrained with handcuffs behind my back lying face down on the floor, I was punched twice in my head and face area by Sgt. [O'Neil] and once to the side of my face by Deputy Vickrey. . . . [W]hen I was face down, fully restrained with handcuffs behind my back, I was punched twice by Sgt. O'Neil and once by Deputy Vickrey, all in my head area after having surgery, while still in my recovery process. This type of force violates my Eighth Amendment right, to be free from cruel and unusual punishment guaranteed to me by the United States Constitution.

(Compl. 4-5.) Based on the foregoing allegations, Joyner makes the following claim for relief:

> Defendants O'Neil and Vickrey violated Joyner's rights under the Eighth Amendment[3] by punching Joyner in his injured face after he had been placed in handcuffs.

Defendants filed a Motion for Summary Judgment (Docket No. 30), providing Joyner with appropriate *Roseboro*[4] notice (Docket No. 32). Defendants contend that Joyner's claim is not administratively exhausted and that no Eighth Amendment violation occurred. Joyner has responded. The matter is ripe for adjudication. For the reasons that follow, the Court will DENY Defendants' Motion for Summary Judgment. (Docket No. 30.)

### I. Standard for Summary Judgment

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is the responsibility of the party seeking summary judgment to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation

---

[3] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

[4] *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975).

2

marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (*quoting* former Fed. R. Civ. P. 56(c) and 56(e) (1986)).

In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere scintilla of evidence will not preclude summary judgment. *Anderson*, 477 U.S. at 251. "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the *onus* of proof is imposed." *Id.* (internal quotation marks omitted).

Additionally, "'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'" *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (*quoting Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 & n. 7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only cited materials . . . ."). Here, the Court bases its disposition of the Motion for Summary Judgment on the attachments to Joyner's Complaint and his submissions in opposition to Defendants' Motion for Summary Judgment and the Defendants' attachments to their Brief in Support of Motion for Summary Judgment.

Defendants' submissions include their own affidavits as well as affidavits of their fellow officers. (Br. Supp. Summ. J. Attachs. 1-6.) Defendants also submitted, *inter alia*, incident reports, copies of Joyner's grievance forms, and copies of the rules governing grievances. (Br.

Supp. Summ. J. Attach. 7 ("Attach. 7").)[5] Joyner's submissions consist of a declaration (Docket No. 28), his own affidavit (Docket No. 35), and copies of various grievance forms (Compl. Ex. 1, at 1-3.)

## II. Summary of Pertinent Facts

### A. The May 22, 2010 Incident

On May 22, 2010, Joyner was incarcerated in the disciplinary segregation block of the Virginia Beach Correctional Center ("VBCC").[6] (Br. Supp. Mot. Summ. J. Attach. 1 ("Greer Aff.") (Docket No. 31-1) ¶ 2.) Master Deputy II Prieur, "while making rounds in the disciplinary cellblock . . . observed that inmate . . . Joyner had covered his cell door window with toilet paper, thus obstructing my ability to see into the cell and to complete my headcount." (Br. Supp. Mot. Summ. J. Attach. 5 ("Prieur Aff") (Docket No. 31-5) ¶ 2.) Prieur instructed Joyner to remove the toilet paper and Joyner refused. (Id. ¶ 3-4.) Prieur then radioed Sergeant O'Neil and other members of the VBCC staff to assist him. (Id. ¶ 4.) O'Neil arrived at Joyner's cell in the company of Deputy Vickrey and two other officers. (Id.)

#### 1. Initial Entry

Upon arriving at Joyner's cell O'Neil ordered Joyner to take down the toilet paper but received no response. (Id. ¶ 6; Br. Supp. Mot. Summ. J. Attach. 4 ("O'Neil Aff.") (Docket No. 31-4) ¶ 7.) Officers told Joyner they would be entering his cell. (Br. Supp. Mot. Summ. J. Attach. 6 ("Vickrey Aff.") (Docket No. 31-6) ¶ 3.) Prieur commanded Joyner to lie face down

---

[5] Attachment 7 to Defendant's "Brief in Support of Motion for Summary Judgment" is a thirty-eight page amalgamation of several different documents. (Docket No. 31-7.) For ease of reference, the Court's citations to these documents utilize their CM/ECF system page numbers.

[6] Joyner states that "[t]he reason I was in segregation was because I had just went through surgery and I had wires in my mouth preventing it from opening." (Joyner Aff. (Docket No. 35) ¶ 3.)

on the floor and to place his hands behind his back. (Prieur Aff. ¶ 6; O'Neil Aff. ¶ 7.) One officer then opened the cell door allowing Prieur, O'Neil, Vickrey, and other officers to enter the cell. (Prieur Aff. ¶ 6; O'Neil Aff. ¶ 7; Vickrey Aff. ¶ 4.)[7]

### 2. Restraint of Joyner - Defendant's Version

Defendants claim that, as they entered the cell, Joyner lunged at Prieur in an attempt to "grapple" with him which resulted in both Joyner and Prieur on the ground. (Prieur Aff. ¶ 7; O'Neil Aff. ¶ 7.) Defendants also claim that Joyner was "noncompliant, combative and repeatedly attempted to engage." (O'Neil Aff. ¶ 7.) O'Neil avers that "[t]o gain control of Joyner I administered two blows to his facial area with a closed fist as allowed in the use of force guidelines for the [VBCC]." (*Id.*) Vickrey states that "Joyner had not assumed a passive position on the floor but became combative and it was necessary for four or five deputies to restrain Joyner and secure him." (Vickrey Aff. ¶ 4.) Both O'Neil and Vickrey state that at no time did Vickrey strike Joyner. (*Id.*; O'Neil Aff. ¶ 9.) "Joyner was eventually brought under control and handcuffed." (Prieur Aff. ¶ 8.) "Once [Joyner] had been handcuffed no additional blows were applied and Nurse Frank came to the cell to examine Joyner, but Joyner was not cooperative and refused medical treatment." (O'Neil Aff. ¶ 8; *see* Prieur Aff. ¶ 8; Vickrey Aff. ¶ 5.)

---

[7] It is not clear from the parties' submissions how may officers entered Joyner's cell. However, it is undisputed that *at least* Prieur, O'Neil, and Vickrey entered. Affidavits submitted by Defendants suggest that other officers entered Joyner's cell along with Prieur and Defendants. (*See* Prieur Aff. ¶¶ 4, 6 ("Sgt. L. Greer and Sgt. G. O'Neal [sic] . . . responded to the floor with Deputy Vickrey and Master Deputy II J. Clark. . . . [W]e entered the cell."); O'Neil Aff. ¶ 6, 8 ("I responded [to] the cellblock. Sgt. L. Greer arrived at the same time together with Master Deputy T. Harrell, Master Deputy Clark and Deputy Vickrey. . . . It took all of the deputies involved to gain control of Joyner."); Br. Supp. Mot. Summ. J. Attach. 3 ("Luft Aff.") (Docket No. 31-3) ¶ 2 ("At the directions of Sgts. O'Neal [sic] and Greer a team of deputies was assembled and upon command I opened the cell door. The deputies then entered the cell . . . .").) (*But see* Greer Aff. ¶ 5 ("I was not in a position to observe inmate Joyner's cell.").)

### 3. Restraint of Joyner - Plaintiff's Version

Joyner contends that "[he] never lunged [his] body at Deputy Prieur what so ever."[8] (Joyner Aff. ¶ 4.) In direct contravention to Defendants' statements, Joyner avers that "[a]fter I was handcuffed and [placed] face down on the floor I was punched twice by Sgt. O'Neil and once by Dep. Vickrey." (Id. ¶ 5.)[9] In his grievances, Joyner asserts that the punches to his face amounted to excessive force because, at the time of the incident, "I [had] stitches on the outside of my face, stiches on the inside of my mouth, and my mouth [was] wired shut." (Compl. Ex. 1, at 3; Attach. 7 at 35.)

### B. Pertinent Grievance Procedures

VBCC has a written grievance procedure. This procedure is incorporated in the Inmate Handbook entitled, "RULES AND REGULATIONS for Virginia Beach Correctional Center." (Br. Supp. Mot. Summ. J. Attach. 2 ("Harris Aff.") (Docket No. 31-2) ¶ 3; Attach. 7 at 31.) Joyner received a copy of the Inmate Handbook prior to May 22, 2010. (*See* Harris Aff. ¶ 4.) The Inmate Handbook states that "[a] grievance procedure is available to all inmates with a guarantee against reprisal. Grievance forms may be requested from a deputy." (Attach. 7 at 32.) Grievable issues include any alleged violation of civil, constitutional, or statutory rights. (*Id.* at 33.)

---

[8] In his institutional appeal of his conviction, Joyner claims that, because of his mouth surgery on May 15, 2010, he "wasnt [sic] physically able to lye [sic] down on the floor, I laid down on my bunk and I was still restrained." (Attach. 7 at 21.) Joyner also states that he "wasn't throwing punches." (Compl. Ex. 1, at 2.)

[9] The record makes plain that the controversy in this case surrounds Joyner's sworn statements that he did not resist Defendants' attempts to control him and that Defendants struck him after restraining him. Neither arguing that such facts are undisputed (Br. Supp. Mot. Summ J. 3, 6) nor stating that "Joyner's conduct belies [the Court] giving credibility" to such facts (*Id.* at 7) can sustain a summary judgment motion. Indeed, Defendants' counsel is admonished that such arguments can run afoul of the Federal rules to a sanctionable degree. Fed. R. Civ. P. 11; *Mercado v. Lynnhaven Lincoln-Mercury, Inc.*, No. 2:11cv145, at 4 (E.D. Va. Dec. 14, 2011) (awarding sanctions regarding "undisputed" facts).

6

Deputies collect completed grievance forms once daily during cell inspections. (*Id.* at 34.) Grievances of an emergency nature (defined by the Inmate Handbook as those related to life, health, and jail security) may be submitted immediately to a deputy. (*Id.*) The Inmate Handbook further provides that:

> Under normal circumstances, [inmates filing grievances] will receive a written response within seven (7) working days. This response will contain the reason for the decision and will be made by someone not involved in the grievance.
> In the event [the inmate filing the grievance has] a legitimate appeal, [the inmate] must request a grievance appeal form from the Grievance Coordinator. Appeals must be filed within 1 business day *upon receiving grievance reply*. . . .
> . . . .
> Written responses including the reason for the decision shall be made to all grievances.

(*Id.* (emphasis added; paragraph lettering omitted).)

### C. Joyner's Grievances

#### 1. The First Standard Grievance

On May 25, 2010, Joyner submitted a "Standard Grievance Form" ("First Standard Grievance") to one of the deputies at the VBCC. (Compl. Ex. 1, at 1.) On the First Standard Grievance, Joyner, describing the May 22, 2010 incident, states that O'Neil and Vickrey punched Joyner in the head and face after placing him in handcuffs. (*Id.*) Nothing before the Court indicates that officials at VBCC ever responded to the First Standard Grievance.

#### 2. The Emergency Grievance

On May 26, 2010, Joyner submitted an "Emergency Grievance Form" ("Emergency Grievance") to a deputy at the VBCC describing the May 22, 2010 incident. (*Id.* at 3; Attach. 7 at 35.) VBCC officials denied the Emergency Grievance on May 27, 2010 because the incident did not meet the requirements for an emergency grievance. (Compl. Ex. 1, at 3; Attach. 7 at 35.) Nothing before the Court indicates that Joyner filed an appeal of this decision.

### 3. The Second Standard Grievance

On June 7, 2010, Joyner submitted another "Standard Grievance Form" (Second Standard Grievance") to a deputy at VBCC. (Compl. Ex. 1, at 2; Attach. 7 at 36.) On the Second Standard Grievance, Joyner again stated that on May 22, 2010, O'Neil and Vickrey, after placing Joyner in handcuffs, punched him in the head and face. (Compl. Ex. 1, at 2; Attach. 7 at 36.) In response to the written question on the form, "What you have done to resolve this complaint," Joyner stated that he "filed a standard grievance on May, 25, 2010. I havent [sic] recieved [sic] nothing back its [sic] been 2 weeks." (Compl. Ex. 1, at 2; Attach. 7 at 36.) VBCC officials addressed the Second Standard Grievance on June 14, 2010 by writing: "Copy Forwarded to the Professional Standards Office for review." (Compl. Ex. 1, at 2; Attach. 7 at 36.) Nothing before the Court indicates that any other response was given.

### 4. The Inmate Request Forms

On June 15, 2010, Joyner filed his first "Inmate Request Form" ("First Request"). (Attach. 7 at 37.) Instructions on the Inmate Request Form specify that the form "is not a grievance form and should not be used as such." (*Id.*) In the First Request, Joyner stated that VBCC had failed to respond to either of his two standard grievances.[10] (*Id.*) On June 16, 2010, in response to the First Request, VBCC personnel stated that "[t]his incident was reviewed [and] you received 2 write ups. I would advise you not to cover the windows and/or cameras again. [Please] review the rules in your inmate handbook."[11] (*Id.*)

---

[10] Joyner indicates in the First Request that he had submitted a previous inmate request form concerning this issue. (Attach. 7 at 37.) However, neither party has submitted any inmate request form dated earlier than the First Request. The Court deems the First Request the earliest inmate request form submitted by Joyner concerning the May 22, 2010 incident.

[11] The "write ups" referenced in the First Request appear to refer to the two "Inmate Violation Report" forms filed against Joyner after the May 22, 2010 incident: one for refusing a direct order to lay on the ground and another for covering the cell window. (*See* Attach. 7 at 19-

On July 9, 2010, Joyner filed a second "Inmate Request Form" ("Second Request"). (Attach. 7 at 38.) In the Second Request, Joyner complains that "I have a grievance form ... which says a copy of this grievance was forwarded to Professional Standards Office for review. Its [sic] been 3 weeks and I havent [sic] gotten anything back stating what action was taken and what was the conclusion that came out of you all investigation." (*Id.*) Joyner further claims that he was "being shown alot [sic] of retribution" from VBCC personnel because of the grievances he had filed. (*Id.*) On July 15, 2010, VBCC personnel answered the Second Request as follows: "I answered your grievance on 061610-(see attached). We have reviewed this incident and this matter is closed. Please review the rule book and follow the procedures accordingly." (*Id.*) VBCC personnel attached a copy of the First Request to their response to the Second Request. (Joyner Decl. Attach. 1 (Docket No. 28-1), at 2.)

### III. Analysis

**A.**  **Exhaustion Analysis**

**1.**  **Legal Requirements**

Because exhaustion of administrative remedies is an affirmative defense, Defendants bear the burden to plead and prove it. *Jones v. Bock*, 549 U.S. 199, 216 (2007). The pertinent statute provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Generally, in order to satisfy the exhaustion requirement, the inmate must file a grievance raising the claim and pursue the grievance through all available levels of appeal. *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006). Additionally, the Supreme Court instructs that section 1997e(a)

---

24.) As a result of these "write ups" (both of which Joyner appealed), Joyner received administrative penalties. (*Id.*)

"requires proper exhaustion." *Id.* at 93. The Supreme Court explains that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules," *id.* at 90, "'so that the agency addresses the issues on the merits.'" *Id.* (internal parentheses omitted) (*quoting Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). Thus, the applicable prison rules "define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218.

Because the statute does not define the term "available," "courts have generally afforded it its common meaning; thus, an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (*citing Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006)). Accordingly, a prisoner who has "utilized all available remedies in accordance with the applicable procedural rules, so that prison officials have been given an opportunity to address the claims administratively . . . . has exhausted his available remedies, even if prison employees do not respond." *Id.* (internal citation and quotation marks omitted) (*citing Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006)).

### 2. Defendants' Failure to Prove Exhaustion

Defendants claim that Joyner failed to exhaust the grievance procedure because he never appealed the Second Standard Grievance. (Harris Aff. ¶¶ 7-10.) In support of this assertion, Defendants have produced an affidavit from Captain L. Harris, the Commanding Officer of Inmate Services and Records at the VBCC. (Harris Aff. ¶ 1.) Harris acknowledges that Joyner submitted the Emergency Grievance and the Second Standard Grievance, but makes no mention of the First Standard Grievance. (Harris Aff. ¶¶ 6-10.) Harris contends that VBCC's response to the Second Standard Grievance, that it had been forwarded to the Professional Standards Office

for review, was an appealable reply. (Harris Aff. ¶ 7 ("A reply to [the Second Standard Grievance] stated that a copy had been forwarded to the Professional Standards Office for review.").) Harris reasons that, because Joyner did not file a timely appeal of the Second Standard Grievance, he did not fully pursue the grievance procedures available to him. (Harris Aff. ¶ 10.)

Defendants fail to demonstrate a lack of exhaustion. Defendants, in their brief, omit mention of the First Standard Grievance altogether, offering the Court no basis to grant relief. The VBCC Inmate Handbook clearly states that an inmate who submits a grievance will receive "a written response . . . contain[ing] the reason for the decision." (Attach. 7, at 34.) An appeal is only appropriate "upon receiving [a] grievance reply." (*Id.*) Here, Joyner submitted his First Standard Grievance on May 25, 2010. (Compl. Ex. 1, at 1.) A deputy, J. Woodward, signed the First Standard Grievance "RECEIVED BY" at 1015 hours on May 25, 2010. (*Id.*) Nothing before the Court indicates that VBCC staff tendered any reply to the First Standard Grievance. Defendants offer no explanation for their handling of the First Standard Grievance procedurally because, in briefing, they ignore its existence completely.

Joyner submitted the Second Standard Grievance on June 7, 2010. A deputy signed the Second Standard Grievance "RECEIVED BY:" at 1029 hours.[12] (Attach. 7, at 36.) The only reply Joyner received to the Second Standard Grievance stated that it would be forwarded to the Professional Standards Office for review. (*Id.*) This response does not contain a decision, or a reason for that decision. It merely informs Joyner that VBCC intended some further action.[13]

---

[12] The receiving deputy's name is unclear; however, the receiving deputy's name is not material in this case. (Attach. 7, at 36.)

[13] The Court views the exhaustion requirement through the objective lens of the reasonable, similarly situated prisoner. Thus, "[t]he court must ask whether 'a similarly situated individual of ordinary firmness' would have deemed [the grievance procedure] available."

11

VBCC never gave Joyner any other response, such as informing him of the investigation results, upon which he could base an appeal. Further, contrary to VBCC's own policy, the response to the Second Standard Grievance does not contain a "reason for the decision" to forward the grievance to the Professional Standards Office. (Attach. 7, at 36.) Thus, the response to the Second Standard Grievance, "Copy Forwarded to the Professional Standards Office for review," *id.*, cannot be construed as a "[w]ritten response[ ] including the reason for the decision" as required by VBCC's grievance policy. (Attach. 7, at 34.)

Accordingly, VBCC's response to the Second Standard Grievance was not an appealable "grievance reply." *Zander v. Lappin*, 415 F. App'x 491, 492 (4th Cir. 2011) ("'[W]hen prison officials prevent inmates from using the administrative process . . . , the process that exists on paper becomes unavailable in reality.'" (second alteration in original) (*quoting Kaba*, 458 F.3d at 684); *Aquilar-Avellaveda*, 478 F.3d at 1225 ("[C]ourts . . . are obligated to ensure that any defects in exhaustion [are] not procured from the action or inaction of prison officials." (*citing Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002))). Moreover, when Joyner inquired about this grievance, VBCC personnel informed him that the matter was closed.[14]

The record before the Court indicates that Joyner "utilized all available remedies 'in accordance with the applicable procedural rules,' so that prison officials have been given an opportunity to address the claims administratively." *Moore*, 517 F.3d at 725 (*quoting Woodford*, 548 U.S. at 88). Joyner did not receive an appropriate reply to either the First or Second

---

*Rivera v. Pataki*, No. 04 Civ. 1286(MBM), 2005 WL 407710, at *10 (S.D.N.Y. Feb. 7, 2005) (*quoting Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004)).

[14] The Court notes that a response to an Inmate Request Form concerning a grievance does not qualify as a response to the grievance itself. This is true because, at VBCC, Inmate Request Forms are outside of the grievance process and do not serve to exhaust inmates' claims. *See Bradley v. Knight*, No. 9:09–1632–TLW–BM, 2010 WL 1838907, at *3 n.7 (D.S.C. Apr. 5, 2010); *Blackburn v. South Carolina*, No. 0:06–2011–PMD–BM, 2009 WL 632542, at *25 n.5 (D.S.C. Mar. 10, 2009).

Standard Grievances; thus, it appears that no remedy was actually available to him beyond their filing. *See Dole*, 438 F.3d at 809 ("[A] remedy becomes 'unavailable' if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting." (*citing Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002); *Dale v. Lappin*, 376 F.3d 652, 656 (7th Cir. 2004))). Because Joyner followed proper procedure and VBCC officials gave too little feedback when handling his grievances, "it cannot be said that [Joyner] failed to exhaust his remedies." *Id.* at 811; *Randolph v. Kelly*, No. 3:08CV708, 2010 WL 883747, at *5 (E.D. Va. Mar. 9, 2010) ("The failure of the [Virginia Department of Corrections] to take advantage [of] this opportunity [to address Plaintiff's claims] should not bar Plaintiff from seeking relief in the courts."). "[E]xhaustion is an affirmative defense, [and] it is the defendants who bear the burden of proving that [a plaintiff] failed to administratively exhaust his [or her] claims." *Brembry v. United States*, No. 7:10CV00388, 2011 WL 4357164, at *9 (W.D. Va. Sept. 19, 2011) (*citing Jones*, 549 U.S. at 212; *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 681 (4th Cir. 2005)). Here, Defendants fail to demonstrate that they are entitled to summary judgment based upon Joyner's lack of exhaustion.

### B. <u>Eighth Amendment Violation</u>

To state an Eighth Amendment claim, an inmate must demonstrate (1) that objectively the deprivation suffered or harm inflicted "was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (*quoting Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). When an inmate claims that prison officials used excessive force against his person, the proof required for the objective component is less demanding and that for the subjective component is more demanding. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). With respect to the

objective component, the inmate must demonstrate that the "nature" or amount of force employed "was nontrivial." *Wilkins v. Gaddy*, 130 S. Ct. 1175, 1179 (2010); *see id.* at 1178 (observing that "a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim" (*quoting Hudson v. McMillian*, 503 U.S. 1, 9 (1992))). Nevertheless, "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Id.* at 1178-79.

With respect to the subjective component, the inmate must demonstrate "'wantonness in the infliction of pain.'" *Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008) (*quoting Whitley v. Albers*, 475 U.S. 312, 322 (1986)). Specifically, "the 'core judicial inquiry' regarding the subjective component of an excessive force claim is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id.* (*quoting Hudson*, 503 U.S. at 7). However, "[t]he 'core judicial inquiry' . . . [is] not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Wilkins*, 130 S. Ct. at 1178 (*quoting Hudson*, 503 U.S. at 7). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . whether or not significant injury is evident." *Hudson*, 503 U.S. at 9 (internal citation omitted).

Defendants claim that as Prieur entered Joyner's cell, "Joyner lunged at him" causing them both to fall to the floor. (O'Neil Aff. ¶ 7.) In direct contrast, Joyner claims that he "never lunged [his] body at Deputy Prieur what so ever." (Joyner Aff. ¶ 4.) Further, Joyner disputes O'Neil's contention that the "blows to [Joyner's] facial area with a closed fist" (O'Neil Aff. ¶ 7) were administered prior to his being handcuffed. (Joyner Aff. ¶ 5.) Defendants claim that

Vickrey never struck Joyner. (O'Neil Aff. ¶ 9; Vickrey Aff. ¶ 4.) Joyner, however, contends that, after he was handcuffed, he was "punched . . . once by Dep. Vickrey." (Joyner Aff. ¶ 5.)

According to Joyner's sworn version of the facts, Joyner remained on his bunk when the officers entered his cell. O'Neil admits administering "two blows to [Joyner's] facial area with a closed fist" (O'Neil Aff. ¶ 7) while Joyner resisted, but Joyner swears he was non-combative and handcuffed as he lay face down on the floor. Joyner states that Vickrey then struck him a third time.[15] These allegations could support an excessive force claim and, thus, summary judgment is inappropriate in this case. *McCreight v. Davis*, No. 97-7826, 1999 WL 11277, at *4 (4th Cir. 1999) (holding that summary judgment was improper because allegations in Plaintiff's affidavit that he was beaten while in handcuffs were enough to support an excessive force claim). Accordingly, Defendants' Motion for Summary Judgment (Docket No. 30) will be DENIED.

### C. Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for violations of constitutional rights that were not clearly established at the time of the challenged conduct." *Iko*, 535 F.3d at 233 (*citing Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It is an immunity from suit rather than a mere defense to liability. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (*quoting Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"'[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion. In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts.'" *Iko*, 535 F.3d at 230 (alterations

---

[15] Any sworn contention otherwise creates exactly the type of material dispute of fact inappropriate for summary judgment.

in original) (*quoting Scott v. Harris*, 550 U.S. 372, 378 (2007)). When assessing a motion for summary judgment in a qualified immunity case, the United States Court of Appeals for the Fourth Circuit has cautioned that:

> When resolution of a case depends on determining what actually happened, "the issue is inappropriate for resolution by summary judgment." *Rainey v. Conerly*, 973 F.2d 321, 324 (4th Cir. 1992). This is because "[d]isputed facts are treated no differently in this portion of the qualified immunity analysis than in any other context." *Buonocore v. Harris,* 65 F.3d 347, 359 (4th Cir. 1995) (*citing Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992)). Accordingly, "summary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants." *Id.* at 359–360 (citations omitted).

*Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 179-80 (4th Cir. 1998) (alteration in original).

As discussed above, a clear dispute of facts exists in this case. *See supra* III(B). Because this dispute of facts "regard[s] the actual conduct of the defendants," summary judgment on qualified immunity grounds is improper. *Vathekan*, 154 F.3d at 180 (internal quotation marks and citations omitted). Accordingly, Defendants' Motion for Summary Judgment (Docket No. 30) will be DENIED.

### IV. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment (Docket No. 30) will be DENIED.

An appropriate Order shall issue.

/s/ MHL
M. Hannah Lauck
United States Magistrate Judge

Date: 2-21-12
Richmond, Virginia